## J. W. EDMUNDSON *v.* J. M. SILLIMAN.

1. SALE IN FRAUD OF CREDITORS.—See facts held evidence of fraud in a sale by a debtor to a creditor, as in fraud of other creditors.
2. SAME—NOTICE.—See facts held sufficient to charge a purchaser with notice of fraudulent intent in a debtor selling his stock.
3. STATUTE OF FRAUDS.—See facts held to evidence a sale to defraud, delay, and hinder creditors in the collection of their debts.

ERROR from Anderson. Tried below before the Hon. R. S. Walker.

August 9, 1876, in Galveston County Court, J. W. Edmundson, plaintiff in error in this suit, recovered judgment against R. S. Kirk for the sum of $360.33 and costs. Upon this judgment execution was issued, directed to Anderson county, Texas, where Kirk then resided, doing business as a hardware merchant, and the sheriff of said Anderson county levied the execution upon a lot of " goods, wares, and merchandise," valued at $734.59. Not having time to sell before return day of execution, the sheriff returned the execution to Galveston County Court, and obtained, on the 30th of October, 1876, an order of sale from said court directing the sheriff to sell the goods levied on, &c.

November 11, 1876, J. M. Silliman, defendant in error, filed his affidavit and claim bond, claiming title to said goods, &c. Ed. Davis, the sheriff, made his return on the order of sale, setting forth that J. M. Silliman had, under the statute, filed his affidavit and claim bond, and the property in controversy being of value more than $500 he returned the papers into the District Court of Anderson county, Texas.

November 22, 1876, J. W. Edmundson, plaintiff in error, tendered issue and filed his plea, alleging the facts as above stated and the levy upon the goods as the property of R. S. Kirk, judgment debtor; alleging that the property at the date of the levy was the property of Kirk, and not the property of Silliman, and traversing the affidavit and claim of

Silliman. Plaintiff in error further charged that Kirk, the judgment debtor, at the time (10th of August, 1876) he made a pretended sale of the goods, if so made at all, to Silliman, was largely in debt beyond his means and in failing circumstances, all of which was known to Silliman, and, colluding and conspiring with Silliman to cheat and defraud his creditors, made and passed the fraudulent bill of sale to the goods; charging that the sale, if made at all, was made in fraud of his creditors and was void.

May 31, 1877, J. M. Silliman filed an answer to the issue tendered, consisting of a general demurrer and general denial.

June 17, 1878, the case was submitted to the district judge for trial upon the law and the facts, neither party demanding a jury; and judgment was then and there rendered by the court for the claimant, decreeing that the property seized by the sheriff under the execution, and sought to be sold under the order of sale, to be the property of J. M. Silliman, and not subject to be sold under the execution.

Motion for new trial was overruled. From the judgment a writ of error was taken and errors assigned—

1. "The court erred in rendering judgment for claimant, James M. Silliman, under the law and the evidence in this case."

2. "The judgment of the court is contrary to the evidence, the burden of proof being upon the claimant, and he failing to establish his claim in law and in fact."

The testimony relied on by Silliman was, substantially, (his own testimony,) "That on the morning of August 8, 1876, I received a note from R. S. Kirk to come to his house and see him. I went to see him, and he and his wife signed the bill of sale hereafter set out to the goods in controversy, and gave it to me in payment of a debt of $203 that T. C. Campbell owed me, for which I held his receipt, indorsed and assumed by R. S. Kirk. I took the bill of sale and came up to the store-house and saw O. T. Brown, who was clerk

in charge. I told him I had bought and owned the stock. He told me that Kirk owed him about $300 for clerk hire, and he (Brown) would not give up the possession of the goods until he was paid. He also told me that the goods were not paid for; that Kirk owed about $800 or $1,000 to P. H. Hennessy & Bro., to T. J. Riley, and to others. I told Brown that I cared nothing about that, I wanted my money; that Kirk had sold me the goods and I would have them. Brown refused to deliver them to me. I sued out the writ of sequestration in suit of Silliman *v.* Brown for the goods, and on the 18th of August, 1876, the sheriff seized them, and had them in possession when the execution in favor of Edmundson was levied upon them. The goods were advertised for sale under the order of sale when I filed the affidavit and claim bond. I then took possession of the stock of goods. I did not know the amount or value of the stock. I took the bill of sale for the whole stock in payment of my debt." * * * "I did not know, nor did I inquire before I purchased, whether Kirk was in debt or not. I knew he was embarrassed or hard run, because he owed me money and could not or did not pay it. The $203 he paid me was for $157 I advanced or loaned to T. C. Campbell in January, 1876, to pay freight on the stock of goods when he brought them here. He did not pay it back, and in May following Kirk assumed it. I called at the store several times to collect the money, but could not get it. Kirk told me, on the morning that he gave me the bill of sale, that he and Brown were not friendly; had had a quarrel, and he feared when they met they would have trouble, and he did not want to go to the store, where Brown was."

J. T. Weidemeyer testified that "Kirk, in spring and summer of 1876, was living in my house, which he had rented from me. He did business on the square on 'Commercial Row,' three doors below Link & Silliman, in the Ozment building. He was embarrassed, in debt, and his credit bad. He owed me for several months' rent, and paid

mc in hardware and goods out of the store. Brown delivered the goods to me about August 10. Brown refused to deliver the goods I bought for rent, and Mrs. Kirk came and told him to give them to me, which he did."

Louis Durr testified: "I knew Kirk at the time spoken of. I bought goods from him about the 1st to 10th of August, 1876, amounting to about $40. Brown delivered them to me, and told me to pay for them to Dr. Silliman, which I did. I know from general report that Kirk, about the 1st and 10th of August, 1876, was in embarrassed and failing condition, and owed debts beyond his means. Claimant Silliman did business on same row, about three or four doors above Kirk's."

George A. Wright testified: "I knew Kirk and claimant about the 1st and 10th of August, 1876. They both did business on the same row in Palestine. Kirk, in commercial circles, stood low,—no credit and in debt. I knew the stock Kirk had on hand. Brown was clerk and manager in charge. T. C. Campbell first brought it here, in January, 1876."

Claimant read the bill of sale, as follows:

"PALESTINE, TEXAS, *August* 8, 1876.

J. M. SILLI——:

For and in consideration of a sum of money due J. M. Silliman, on a note due to and made payable to him by T. C. Campbell, dated January 12, 1876, for the sum of $157.50, with interest as specified in said note, amounting at this date to $203.72, being now due and unpaid, we do hereby sell and convey to the said Dr. J. M. Silliman all the goods, wares, and merchandise now in and contained in the store now occupied by the undersigned, (late J. W. Ozment building,) consisting in part of glassware, tinware, knives, two jack butcher knives, spoons, files, augurs, axe handles, lamps, washboard, coffee mill, and in fact all and singular the goods contained in said building, except goods sold but not delivered to J. T. Weidemeyer, and tools in warehouse, he to take

possession of store and warehouse and hold same for us immediately.

(Signed) ROBERT S. KIRK.

MARY A. KIRK."

The testimony of Brown, the clerk of Kirk, was taken by depositions and read by Edmundson. Brown's testimony, not being considered in the opinion, is not given.

*T. T. Gammage,* for plaintiff in error.

I. If defendant in error had knowledge, such as the law infers, of R. S. Kirk's intended fraud against his creditors, the sale to Silliman comes under section 2 of the statute of frauds, (Paschal's Dig., art. 3876,) and is void. (Lynn *v.* Le Gierse, 48 Tex., 138; Walcott *v.* Brander, 10 Tex., 424.)

II. Silliman had reasonable cause to believe Kirk to be insolvent. (Buchanan *v.* Smith, 16 Wall., 277; Rea *v.* Missouri, 17 Wall., 532.)

III. A transfer of a debtor's property, with a view to se-. cure his property to one creditor, is a transfer in fraud, under the bankrupt act. (Toof *v.* Martin, 13 Wall., 40.) In such a case the burden of proof is upon the claimant to show his ignorance of the transferee's insolvency. (Id.)

IV. The great disproportion between the amount of the price paid by Silliman and the value of the goods will, with slight additional circumstances, justify the inference of fraud. (Reeves *v.* Shry, 39 Tex., 636; Allen *v.* Stephanes, 18 Tex., 658; Chamblee *v.* Tarbox, 27 Tex., 145; McFaddin *v.* Vincent, 21 Tex., 47; Burch *v.* Smith, 15 Tex., 223.)

V. Every presumption in this case is in favor of the proof of the fraud of the conveyance to Silliman from Kirk, and fraud may be proved by presumptive evidence. (Briscoe *v.* Bronaugh, 1 Tex., 335; Graham *v.* Roder, 5 Tex., 147; Thompson *v.* Shannon, 9 Tex., 538.)

VI. The consideration paid by J. M. Silliman in this case ($157.50) was wholly disproportionate to and inadequate for

the value of goods received by him, to wit, $734.59, together with $40 in money received from Louis Durr for goods sold by Kirk to Durr, making a total in value of $774.59. The sale not being for a *bona-fide* and sufficient consideration, would be regarded as fraudulent as to the other creditors. (Reeves *v.* Shry, 39 Tex., 636.)

Under the second error assigned, we submit—

1. The property in controversy in this suit was taken from the possession of Ed. Davis, sheriff, a "person other than the claimant"; therefore the burden of proof was upon the claimant Silliman to establish, by full and competent proof, his right and title thereto, else judgment should have been rendered against him. (Paschal's Dig., art. 5312–5316; Kent *v.* White, 27 Ind., 390; Veiths *v.* Hagge, 8 Iowa, 163; Sparks *v.* Rawls, 17 Ala., 211.)

2. That the evidence in this case shows that claimant Silliman had full knowledge, or could have had, of the indebtedness of Kirk, the defendant in execution; of his embarrassed condition financially; of his inability to pay; that the property in controversy was all the property he had subject to execution; his (Kirk's) general habits and business dealings; and from all this, which is in proof, judgment should have been for Edmundson, and not for defendant in error. (Stadtler *v.* Wood, 24 Tex., 624; Walmsley *v.* Hubbard, 24 Tex., 614.)

3. The preponderance of proof in this case is largely in favor of the goods being subject to sale under the execution in favor of the plaintiff in error, while the burden of proof was on the defendant; therefore the plaintiff should have recovered. Merely getting bill of sale is not proof of parting with title. (Brandon *v.* Cabiniss, 10 Ala., 155; Spaulding *v.* Harvey, 7 Ind., 429; Magee *v.* Scott, 9 Cush., (Mass.,) 148; Morgan *v.* Taylor, 32 Tex., 366.)

4. There was no complete sale to Silliman by Kirk;—not such a one as would defeat the rights of an execution creditor of Kirk. (Morgan *v.* Taylor, 32 Tex., 366; 1 Pars. on

Cont., 441, 442; Samuels *v.* Gorham, 5 Col., 226; Barr *v.* Reitz, 53 Penn., 256; Moore *v.* Kelley, 5 Vt., 34.)

*T. J. Williams,* for defendant in error.

MOORE, CHIEF JUSTICE.—The only question in this case is, Does the evidence upon which it was submitted to the court warrant the judgment? Giving to it the most favorable construction for appellee of which it is susceptible, we feel constrained to say that, in our judgment, it does not.

Without pausing to consider upon whom the burden of proof properly devolved, and entirely discarding from our consideration the testimony of appellant's witness, we think the evidence shows, beyond all question, that the bill of sale from Kirk and wife to appellee was made by the former with the intent to defraud, delay, and hinder their creditors in the collection of their debts; and that appellee must be held chargeable with notice of this fraudulent purpose, if, indeed, the evidence is not amply sufficient to show that he was not in fact cognizant of and a participant in this fraudulent design. Looking at the transaction in the light it is presented by appellee's testimony alone, it is difficult to conceive that there was not some secret understanding between the parties to a transaction so extraordinary and apparently so greatly at variance with the regular course and usage of business. Appellee knew that Kirk was hard pressed; that he had agreed to pay him five per cent. per month for money borrowed to pay freight bills. Their places of business were within a few doors of each other. It is hardly possible that appellee could have been ignorant of Kirk's pecuniary embarrassment and utter want of credit, which seems, from the testimony of his own witnesses, to have been a matter of general notoriety in the community in which they lived. Doing business so near him, he must have had some general knowledge at least of the amount and value of Kirk's stock. He could not have thought that a man of capacity to make

a business transaction could, for an honest purpose, wish to convey his entire stock, amounting to more than $700, and, as we are warranted in supposing, all his property which could be reached by his creditors, to a single creditor, to pay a debt of but $203. If it had been the purpose of the parties to make a fair and *bona-fide* sale and purchase of the goods, there surely would not have been such secresy in the offer to sell or such haste in the consummation of the trade as were exhibited in this transaction.

Other facts, tending in the same direction, are exhibited in the record, but further comment is deemed unnecessary.

The judgment is reversed and the case remanded.

REVERSED AND REMANDED.