BLANKENSHIP & BLAKE v. G. A. TURNER.

(No. 3007.)

APPEAL from Ellis County.    Opinion by WHITE, P. J.

GRACE & TEMPLETON, counsel for appellants.

No counsel appeared for appellee.

§ 427. *Fraudulent sale of goods; facts held to show a; case stated.* In a suit by Blankenship & Blake, appellants, against one T. A. Brewer, in the county court of Ellis county, wherein an original attachment was issued, a writ of garnishment was sued out against G. A. Turner, appellee herein, who answered, denying indebtedness to Brewer, or possession of any of his effects, etc. This answer was traversed, and it was alleged, in substance, that said Brewer, shortly before the writ of garnishment was served on Turner, and while he, the said Brewer, was insolvent, and with intent to hinder, delay and defraud his creditors, had sold said Turner a lot of goods, wares and merchandise, greater in value than the amount of plaintiff's debt, for an insufficient consideration, and that said Turner, when he purchased, had notice of the fraudulent intent of said Brewer in making such sale, etc.

Upon issues tendered and joined upon this answer and traverse, the case went to trial before the court at the April term, 1888, of the county court of Ellis county, and resulted in a judgment in favor of the garnishee, Turner, from which Blankenship & Blake prosecute an appeal to this court.

From the testimony of appellee himself the following facts appear: Brewer had been talking to him for several days of selling out to him. On the morning of the 23d of December, 1885, Brewer asked appellee what was the best

he would do, and was offered sixty-five cents on the dollar of cost price.  The night of same day, about 8 o'clock, Brewer accepted this offer, saying he had been trying that day, over town, to sell his goods, and that was the best offer he had had.  Appellee agreed to buy, and proposed to take an invoice next day.  Brewer said, "No, let's do it to-night; to-morrow will be a busy time;" and appellee and his clerk, Brewer and his clerk went to work taking the invoice, which was finished the same night and the goods moved into appellee's store.  These goods invoiced $987 in value, and $638 in cash was paid for them.  Appellee bought the goods because he thought there was money in them, and did make money out of them, and sold them at a profit of twenty-five per cent. over first cost and carriage.  Appellee had already other goods of the same kind, and mixed the goods bought of Brewer with others of like character already on hand. Appellee was a merchant of fifteen years' experience, having been at Ferris seven or eight years.  He knew the wholesale merchants of Dallas — Blankenship & Blake, Marsalis and others.  Dallas is about twenty miles from Ferris, and Brewer frequently went to Dallas.  R. P. Mackay was express agent at Ferris.  There was no bank there, and it is customary for wholesale merchants to draw on retail merchants at Ferris through the express agent.  In fact the express agency is a collecting agency in towns where there are no banks.  Drafts had sometimes been drawn on appellee that way.  The express office was two hundred or three hundred feet from appellee's store, and he saw the express agent every day. The next morning after the sale R. P. Mackay, the express agent, came over to appellee's store and said he had a draft against Brewer for about $70, but Brewer had then been paid for his goods.  The next day after the sale the agent of Blankenship & Blake came down and threatened to take the goods appellee had bought of Brewer, and "cut up considerable" about the sale.  In making out the invoice of goods Brewer's bills were be-

fore them and the invoice was made from them. It is customary for wholesale merchants, in sending out bills of goods sold, to make them out on their bill-heads with terms of sale thereon, but appellee paid no attention to this. Appellee helped work on the invoice till about 12 o'clock, when they were about half through it. He then went to bed in a back room, and the others finished the invoice and moved the goods, finishing about or before daylight. Appellee had received letters of inquiry about Brewer's financial condition, and supposed all, or nearly all, retail merchants bought goods on a credit. He knew that if Brewer was in debt he could not buy his goods and pay cash for them. He knew that Holland had loaned Brewer money to pay a draft, which he supposed would be repaid out of the money he paid Brewer, but didn't know whether it was or not. Because he knew that Brewer could not sell out for cash, if in debt, he asked Brewer the direct question whether he owed any debts, and was answered in the negative; but he did not inquire on this subject of Brewer's clerk, or of the express agent, nor of Dallas merchants; did not ask any one except Brewer himself and Holland, who told him of the money loaned to pay a draft. He didn't pay any attention to Brewer's bills of goods that were used in making the invoice at the date of purchase, though these bills showed the terms on which the goods were purchased. The negotiations for a trade between him and Brewer were pending six or seven days, during which time Brewer appeared to appellee anxious to sell, though the other testimony shows that no one else in Ferris, not even Dr. Long, Brewer's intimate friend, had any idea that a sale was contemplated. Brewer pretended to wish to sell out to go into business elsewhere; yet he was trying to sell two days before Christmas, December 23d, at a discount, when he had been in business but a little over a year, and was anxious to close up the trade and move the goods in the night-time because the next *would be a busy day.* The goods were moved

by daylight, or sun-up of next morning, and about that time were paid for with money from appellee's pocket, in the presence of Mr. Holland, Turner's clerk. Ferris is a little town of about two hundred and fifty inhabitants, in Ellis county, in which were six or seven stores, and Brewer's store was about one hundred feet from Turner's. Turner's store was his *home*, to which he was going with his wife when accosted by Brewer in respect to the final trade; and Turner was so much interested in this trade that he did not return to his wife that night, but worked and slept the whole night in Brewer's store, within a hundred feet of her. The parties who occupied the store between Turner and Brewer knew nothing of Brewer's desire to sell out, and were surprised when he sold. They testify that his stock was worth $900 or $1,000.

*Held:* These facts establish that Brewer was seeking to make the sale for the purpose of defrauding his creditors. His conduct is irreconcilable with good faith and honesty of purpose, and was such as should have aroused the suspicion of any prudent man who contemplated dealing with him. A sale made with the intention of defrauding creditors is of no effect against them, if the vendee knew of that intent, or had notice of such facts as would excite the suspicion of a man of ordinary prudence and put him on inquiry as to the reasons and motives of the vendor in making the sale. [Blum v. Simpson, 66 Tex. 84; citing Mills v. Howth, 19 Tex. 259; Taylor v. Townsend, 61 Tex. 146.] And if one not a creditor purchases the property of an insolvent debtor, with knowledge that the debtor intends by selling to place the property beyond the reach of his creditors, such purchase will not protect against the creditors, although the purchaser may pay an adequate consideration for the property. [Greenleve, Block & Co. v. Blum, 59 Tex. 124. For a case very similar to this one, see Edmundson v. Silliman, 50 Tex. 106.]

December 5, 1888.          Reversed and remanded.