## LEON & H. BLUM v. H. E. SIMPSON.

(Case No. 5294.)

1. SALE TO DEFRAUD CREDITORS—NOTICE—A sale made with the intention of defrauding creditors is of no effect against creditors, if the vendee knew of that intent, or had notice of such facts as would excite the suspicion of a man of ordinary prudence, and put him on inquiry as to the reasons and motives of the vendor in making the sale. (Mills v. Howth, 19 Tex., 259; Traylor v. Townsend, 61 Tex., 146.)

2. SAME—EVIDENCE—See opinion for evidence presenting an array of circumstances. sufficient to put a vendee upon inquiry as to the fraudulent intent of his vendor.

3. LANGUAGE OF COUNSEL—See facts for language of counsel not warranted by the evidence, and tending to prejudice the jury. The fact that the opposite counsel had an opportunity to reply does not affect the question.

4. SAME—VERDICT—Improper remarks of the successful counsel are presumed to have influenced the minds of a jury, and are ground for reversal, if the verdict was against the great preponderance of evidence.

APPEAL from Bell. Tried below before the Hon. B. W. Rimes.

On May 9, 1882, I. A. McLure was doing a mercantile business in the little hamlet of Rogers, in Bell county, and sold out his store house and lot and dwelling house to H. E. Simpson for $3,000, Simpson paying him $800 in cash and executing his three promissory notes in the sum of $733.33⅓, payable in six, twelve and eighteen months from date, at ten per cent. interest, to W. F. McLure or bearer. W. F. McLure was the brother and partner, it seems, of

I. A. McLure. The notes were all paid subsequently by Simpson. Simpson was a physician and postmaster at Rogers, and kept the office in McLure's store. It further appeared, that on September 9, 1881, and January 19, 1882, appellants had procured the signature of McLure to certain instruments in writing known as "iron-clad notes," which were due some months previous to the sale to Simpson. On May 15, appellants sent up an agent to see McLure, who found that McLure had sold out to Simpson. On May 19, 1882, appellants, by their attorneys, Scott & Levi, sued on the "iron-clad notes." On the same day, B. R. A. Scott, claiming to be an attorney for McLure, appeared in the district court, at Galveston, and confessed judgment for the sum of $2,299.16, and on the same day execution was sent to Bell county, and levied on Simpson's stock of goods. Simpson filed his claim bond, and at the fall term, 1884, appellants tendered the issue, charging fraud on the part of both McLure and Simpson, and notice of McLure's intent to hinder, delay and defraud his creditors, by making this sale, etc., etc., all of which was denied by Simpson in his answer, and he also alleged purchase for valuable consideration in good faith, want of notice to him of any intent on McLure's part, to hinder, delay or defraud his creditors, want of knowledge on his part that McLure had any creditors, or that he was insolvent, etc., etc. The case was tried, and the jury rendered a verdict for Simpson.

On the trial, one of the counsel for appellee, addressing the jury, said that "McLure must have been in good commercial standing and credit to have been indebted so long a time to Leon & H. Blum, for it is a matter of history, in this country, that no man, not in good standing and credit, can owe Blum long without being pounced down upon, etc.;" to which language counsel for appellants then and there objected, as calculated to prejudice the minds of the jury against plaintiffs, and saved the point by bill of exception, which was granted by the judge with this explanation: That appellants' counsel had, in his argument, stated to the jury that McLure had been largely indebted to plaintiffs for months and months before he sold out.

After this language had been used by one of the counsel for appellee, another of his counsel, addressing the jury, said, in substance: "Counsel for plaintiffs can take a bill of exception, if he likes, to what I am about to say: it is also a matter of history that, over 1800 years ago, a certain set of men crucified our Savior and afterwards, lots were cast for his raiment, and this same set of men, the Jews, have been dealing in old clothes for a living ever since, and grinding the faces

of the poor and unfortunate. Leon & H. Blum, the plaintiffs in this case, belong to the same set of men.''

The court took no open notice of this language; did not rebuke, interrupt or restrain counsel therein, and to this action of the court, as also to the action of counsel in using the language, appellants objected, as calculated to prejudice the minds and inflame the passions of the jury against plaintiff, and saved the point by bills of exception. The opinion states the additional facts.

*Scott & Levi*, for appellants, as to notice of fraudulent intent, cited : Greenleve, Block & Co. *v.* Blum, 59 Tex., 127; Traylor *v.* Townsend, 61 Tex., 146; Seeligson *v.* Brown, 61 Tex., 132.

In reference to the language used by counsel, they cited : Willis *v.* McNeil, 57 Tex., 475; R. R *v.* Jarrell. 60 Tex., 270; R. R, *v.* Levy, 59 Tex., 551; Blum *v.* Rogers, Tyler term, 1884.

*Harris & Saunders*, for appellee, on fraudulent intent and notice of such intent, cited : Paxton *v.* Boyce, 1 Tex., 317; Tompkins et al. *v.* Bennett, 3 Tex., 36; Turner *v.* Lambeth, 2 Tex., 365; DeLeon *v.* White, 9 Tex., 599; Kellum *v.* Smith, 18 Tex., 835; Layton *v.* Hall, 25 Tex., 204; Giddings *v.* Steel, 28 Tex., 735; Weisiger *v.* Chisholm, 28 Tex., 780.

WILLIE, CHIEF JUSTICE.—It is apparent, from the evidence, that the intention of I. A. McLure, in making the sale to Simpson, was to defraud his creditors, and the only question in the case is, did Simpson know of this intent, or have notice of such facts as would excite the suspicions of a man of ordinary prudence, and put him upon inquiry as to the reason and motives of the vendor in making the sale? Mills *v.* Howth, 19 Tex., 259; Traylor *v.* Townsend, 61 Tex., 146.

The evidence does not show that Simpson had any actual knowledge of McLure's design in selling out his property, or of any debts existing against him. We have only to inquire, therefore, as to whether he was in possession of sufficient facts to arouse his suspicions as to the fraudulent intent of McLure in selling out his property.

It was shown that the property was sold for less than it was worth. This was what induced Simpson to buy it. The sale was out of the usual course of trade, and made without any inventory of the goods having being taken. McLure appeared to be doing a prosperous business at the time, and had just bought goods to replenish his stock. Why a merchant, apparently doing a good business, should suddenly propose to sell out, not only his stock on hand, but newly purchased goods not yet arrived, at a price below their value, together with the

house where he was doing business, and, so far as the purchaser knew, strip himself of all property liable for the payment of his debts, was a question which would have suggested itself to almost any one contemplating a purchase of the property. But the fact in this case was rendered more suspicious for the reason that the seller required that the purchase money not paid in cash should be secured by notes, not made payable to himself, but to his brother, living in a distant state; and not only so, but that they should be made payable to bearer, instead of to the order of the payee. It must have occurred to the purchaser, that something so unusual was required for some special purpose. It must have occurred to him too that McLure might have intended to give the notes the appearance of being the property of another, and yet, at the same time, reserve to himself the privilege of disposing of them, as he afterwards did, for his own benefit. The reason given by him for having this form given to the notes was a very poor one, viz.: that his brother was interested in the business. If these notes were to be sent to his brother in satisfaction of his interest in the property sold, it was certainly better that they should be made to his order; if they were to be used for his benefit in whole or in part at the point where the transaction took place, there was no reason whatever why his name should be placed in them at all.

Simpson must also have known that if McLure had any creditors his purchase of the property deprived them of all legal recourse for their debts, and placed them at the mercy of the seller. He had reason, too, to believe that McLure owed defendants. He knew that McLure had purchased goods on credit; for, but a short time before, a commercial man had collected a debt from McLure by taking six bales of cotton in payment of it. Not only so, but, at the very time the trade for the property was first proposed by McLure's clerk to Simpson, McLure himself was in Galveston purchasing goods; and Simpson knew, before the trade was made, that he had bought goods there, for they were in transit at the time and included in the sale. These were circumstances rendering it probable that McLure was indebted at the time he disposed of all the estate he had subject to execution.

Taking all these circumstances in connection, it does seem that there was enough to arouse a suspicion in the mind of any prudent man that there was an intention on the part of McLure to dispose of his property in such way that, if he had any creditors, of which there was great probability, they would be deprived of all power to enforce their claims against him. Yet he made no inquiry as to whether or not McLure owed debts, but said "it was none of his business, and he

didn't care." This showed a disposition on his part to make the trade and get possession of the property at a low figure, no matter how much the seller's creditors might suffer thereby. To meet this array of facts tending to put Simpson upon notice of McLure's intentions, we are pointed, by appellee's counsel, to the fact that the former inquired, before buying, as to whether there were any liens, mortgages or other encumbrances on the property, and that he even examined the records to ascertain in reference to that matter, and to the fact that he inquired why McLure wished the notes made payable to his brother. We regard these facts as rather strengthening the other testimony tending to show that Simpson's suspicions were aroused as to McLure's fraudulent intentions. He asked and examined the records as to liens, because he knew, if registered, they would affect his title, whether he knew of them or not; but he avoided asking as to other debts, because if he knew of their existence, he would be charged with notice of the fraudulent intent of his vendor. He showed his want of confidence in McLure by refusing to take his word as to the liens, and examining the record himself. His inquiry as to the reason why McLure wanted the notes made payable to his brother shows that he thought the requirement a singular one. He had never heard of this brother before.

We think the evidence presents an array of circumstances tending to put the appellee upon inquiry as to the fraudulent intent of McLure in making the sale to him, which are not affected by any of the facts which, it is contended, tend to show the fairness of the purchase. The verdict of the jury is so directly against the great weight of the testimony as to lead us to the conclusion that it must have been in some measure affected by the manner in which the case was presented to the jury by the counsel for the claimant.

The language of counsel, made the subject of the first assignment, was certainly not warranted by the evidence, and tended to prejudice the jury against the plaintiffs. It could not be excused on the ground that the opposite counsel had traveled out of the record in stating that McLure had been for a long time indebted to Leon & H. Blum, for the evidence showed this to be the case. Bills of exception to the use of this language were saved by the appellants, and they were made a ground of the motion for new trial. The fact that the plaintiffs' counsel had an opportunity to reply did not affect the question, for it is not the policy of the courts to encourage a war of inflammatory and unwarranted words between counsel on the opposite sides of a cause.

Had the verdict not been against the great preponderance of the

evidence, we might not have disturbed it, for the presumption would have been that it was not influenced by these remarks of the appellee's counsel.   But the finding is so little in accordance with the proof that it is highly probable the improper remarks had some influence upon the minds of the jury, and the judgment will be reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered April 16, 1886.]