## CHICAGO, ROCK ISLAND & TEXAS RAILWAY COMPANY v. ROSA LANGSTON.

### Decided November 26, 1898.

**1. Practice in Trial Court—Physical Examination in Case of Personal Injury.**

Refusal of defendant's request in an action against a railroad company for personal injuries to allow medical experts of its own selection to examine the plaintiff's injured limbs and give their opinions as to whether she was capable of using artificial members, is reversible error where she exhibited such injured limbs in the presence of the court and jury, and had physicians to testify that she would never be able to wear artificial limbs, and the only specific objection urged was that the proposed experts were in the defendant's employ and might be biased. HUNTER, Associate Justice, dissenting.

**2. Same.**

Defendant in an action for personal injuries is entitled to have experts of its own selection examine an injured member of the plaintiff which she exhibited to the jury, and is not required to accept such experts as may be agreed upon by the parties and appointed by the court.

**3. Improper Argument of Counsel—Reversal.**

A judgment for plaintiff in an action against a railroad company for personal injuries will be reversed where it is unusually large in amount and the plaintiff's counsel in his argument to the jury, without any support in the evidence and in violation of the rules, charged that the operatives in control of the train by which plaintiff was injured were drunk, as under the circumstances it can not be said that the jury were not improperly influenced thereby.

APPEAL from Montague. Tried below before Hon. D. E. BARRETT.

*Graham & Turner* and *J. M. Chambers,* for appellant.

*C. B. Randell* and *W. W. Wilkins,* for appellee.

STEPHENS, Associate Justice.—In attempting to board one of appellant's passenger trains at Bridgeport, Texas, on the night of September 13, 1895, appellee fell or was thrown under the car, and in consequence thereof both of her feet were crushed and had to be amputated. On account of this severe injury and great loss, she recovered a verdict and judgment for $25,000, from which this appeal is prosecuted.

On the question of appellant's liability the evidence both as to negligence and contributory negligence was conflicting, and that issue was fairly submitted to the jury, both in the rulings on the evidence and in the charge, though possibly there was error in permitting a certain line of argument complained of. We proceed, therefore, to consider the exclusion of certain expert testimony affecting the measure of recovery.

Upon her examination in chief, she being the first witness, appellee, after fully describing her injuries, unwrapped her injured limbs and exhibited them in the presence of the court and jury. Just before doing so she testified: "My right leg is still sore. The other one is healed up. They are both tender. I have some little tin things that I put on my legs when I move from one place to another, and my daughter and son with me. It takes two persons to lift me. I can not bear any weight on my right leg." Here the tin things, termed cans by some of the witnesses, were shown to the jury, attended with an explanation of how they were worn.

Just before resting her case she offered Dr. Poindexter as an expert witness, who testified: "I examined her limbs where the amputation was performed this morning. One is partially healed, and the other is not. It is in a very irritated condition, and my notion is, will probably be that way always. I do not think it will ever heal. I do not think it would be a very good idea to amputate any more. I would consider it dangerous now to her life. She can not use artificial limbs on those stumps. You can use only on healed stumps; hers are unhealed. You could not use artificial limbs on either one of them. One looks like it has been healed. The other one never has been healed. At least it shows places there that there might be indications of pus. It is irritated, red and inflamed." Upon further examination, cross and redirect, his testimony tended to prove that, in his opinion, the limbs would never heal, because of "a deposit of calcine matter," and that this condition resulted from the splitting of the bones at the time of the injury; and also that, in his opinion, no harm resulted from the use of the tin cans.

Appellant offered as experts in its behalf Drs. Saunders and Reily, who qualified themselves as such. Dr. Saunders testified: "I haven't examined the plaintiff in this case. Taking the plaintiff, injured as she is, I think I could tell by an examination, with reasonable certainty, whether the stubs of her limbs would ever get well enough for her to wear artificial limbs." He then proceeded to explain how an examina-

tion would enable him to determine whether artificial limbs could be worn, and stated positively that such examination would enable him to tell whether the existing trouble was due to a diseased bone. His testimony was at variance with that of Dr. Poindexter as to the advisability and effect of wearing the tin cans.

Dr. Reily had amputated the limbs soon after the accident, more than two years before the trial, and testified: "If I should examine her now, I think I could tell whether she is now able or would at any time hereafter be able, with proper care and treatment, to wear or use artificial limbs. I advised her while treating her that she would be able to wear artificial limbs. I told her that she would be able to wear them in four months. She moved away before the time was out."

Appellant was denied the opportunity on the trial of having these witnesses examine the injured limbs and testify in relation thereto, as will more fully apear from the following bill of exceptions: "Be it remembered, that on the trial of the above entitled cause the defendant requested of plaintiff's counsel permission for Dr. Bacon Saunders and Dr. H. Reily, surgeons of defendant, and in defendant's regular employment, to examine the condition of plaintiff with reference to her injuries, which permission was refused by plaintiff's counsel, on the ground that said Saunders and Reily were in the employment of the defendant, and plaintiff's counsel offered to have plaintiff examined by any number of physicians the court might see proper to appoint on defendant's application who were not in any way connected with plaintiff or defendant; that defendant's counsel thereupon made application to the court, and requested the appointment of said Saunders and Reily to examine the plaintiff; that thereupon plaintiff's counsel made the same objection they had made to defendant's counsel, and renewed their said offer; that defendant's counsel thereupon said they would not insist upon the appointment of Dr. Reily, but would be willing for the court to appoint a commission of three physicians and surgeons to examine plaintiff, provided one of them was the said Dr. Bacon Saunders; that the reason that the defendant insisted on the appointment of said Dr. Saunders was because of his known reputation as a surgeon, and because defendant's counsel did not believe that his equal was accessible to the court; that plaintiff's counsel objected to the appointment of Dr. Saunders on the ground that he was in the employment of defendant and had been brought here by defendant from Fort Worth for the express purpose of testifying in its behalf, and on the ground that he might be a partisan, but stated that any three doctors or any number of doctors whom the court would regard as competent and impartial, and who were not connected by employment or otherwise with the plaintiff or defendant, would be acceptable to plaintiff, and plaintiff had no objection to such commission being appointed by the court to make such examination; that the court asked plaintiff's counsel if Drs. Saunders, Reily, and Stinson would be satisfactory, whereupon they objected to Drs. Saunders and Reily for the reasons stated above; that they did not know Dr.

Stinson, but if the court thought that he was competent and impartial, they did not object to him, or any number of doctors of that description; that thereupon defendant's counsel objected to the appointment of any commission unless the said Dr. Saunders was also appointed, because of his said reputation as above stated; that the court then said that he would appoint Dr. Stinson, if he was satisfactory to the parties, and he could act or not as they saw proper; that thereupon the defendant introduced Drs. Saunders and Reily, and asked each of said witnesses if he could tell by an examination of plaintiff's injuries whether or not she, the plaintiff, would ever be able to use artificial limbs, which question both of said witnesses answered in the affirmative; that thereupon defendant's counsel propounded the following interrogatory to each of said witnesses separately: 'Doctor, will you please here and now examine the plaintiff and her injuries?' That plaintiff's counsel objected, on the ground that said witnesses were in the employment of the railway company, and were partisan and not impartial, and that they had not been appointed by the court to make such examination, and defendant had no right to have such examination made without consent of plaintiff, and that plaintiff was ready to submit to an examination by doctors considered by the court to be impartial and competent, and who were not in any way connected by employment or otherwise to plaintiff or defendant, which objection was sustained by the court, and the defendant excepted and here tenders this its bill of exceptions, the same being number 16. Defendant could have proved by said witnesses that plaintiff could at that time wear artificial limbs without pain, and get about on them in such manner that her injuries could not be detected in her locomotion. The conversation between the court and counsel relative to the appointment of a commission above referred to was not in the hearing of the jury."

Dr. Stinson being thus permitted to make an examination, did so, and was offered as a witness by appellee. After describing what his examination disclosed, he was asked: "Take that limb in its present condition, and allow it to go on without an operation, could she use an artificial limb?" To which he answered: "It is possible that a limb might be devised where the pressure would not fall on the end of the stump. It is possible to devise an artificial member, where the stump would not be in contact with the limb, and it might be possible for her to wear it. If the stump should come in contact with the artificial member, she could not wear it." In the main, however, his testimony was favorable to the appellee, and tended to show that artificial limbs could not be used, though not so much so as that of Dr. Poindexter. No other experts were introduced.

In this state of the record, was it material error for the court to refuse the request of appellant to have experts of its own selection examine the injured limbs so exhibited to the court and jury, and give their opinions as to whether appellee was capable of using artificial limbs? If error at all, it was clearly material. The amount of the

verdict should, and doubtless would, have been materially less if the jury had believed that, instead of being a helpless cripple for life, appellee was capable of locomotion by means of artificial limbs. It is to be inferred from the record that the testimony of Drs. Saunders and Reilly, if they had been permitted to make the necessary examination, would probably have been favorable to appellant. But if not, the bill of exceptions above contains a positive statement to that effect, which we accept.

Every lawyer of experience in the trial of cases knows that experts differ widely in opinion on such matters, quite as much so as experts themselves differ in reputation and skill. It is not, therefore, for the court to determine in advance what experts the jury shall believe. That is the peculiar province of the jury. The fact that Saunders and Reily were in the employment of appellant as surgeons went to the weight and not the admissibility of their testimony, for any relevant testimony they were capable of giving would not have been excluded upon this ground.

As this was the single specific ground of objection urged to their making an examination of the injured limbs, preparatory to giving an opinion, we come to the question, seeing that the ruling was probably prejudicial, whether the court erred in denying appellant's request for such preliminary examination. If appellee had not made profert of her injured limbs to the court and jury, the request to have experts appointed by the court to make an examination over her objection would present the question which has been repeatedly before the courts, and upon which the decisions are in hopeless conflict, so much so that judges of the same court, notably of the Supreme Court of the United States, are divided in opinion upon it. For the two opposing lines of argument, see the majority and minority opinions in Railway v. Botsford, 141 U. S., 250. This court, and presumptively our Supreme Court, stands committed to the views expressed by the majority of the court in the Botsford case. Railway v. Pendery, 14 Texas Civ. App., 60, in which writ of error was refused.

But inasmuch as appellee invited an inspection and examination of her wounded limbs by making profert of them on the trial, we have finally concluded that the case presents a different question from that so often considered, and that its solution should not be influenced by our cherished Anglo-Saxon principle of personal security. In our opinion, it would be a perversion of that principle to apply it in a case like this, where the plaintiff, unfortunate and pitiable though she be, voluntarily lays bare before the court and jury her afflicted members for the inspection and examination of the judge, jury, and advocate. For all the purposes of the trial, she thus waived her right to object, upon the ground of an invasion of her right of personal security, to a reasonable and proper examination, under the direction of the court, of the wounded parts. She thus by her own voluntary act conferred upon the court jurisdiction to compel what otherwise she

might have refused to submit to. Having conferred the jurisdiction, she could not take it away at pleasure without trifling with the court. It lasted as long as the trial lasted. In our Bill of Rights it is provided that the accused in a criminal prosecution "shall not be compelled to give evidence against himself," and yet it is held that if he voluntarily takes the witness stand he must submit to cross-examination.

It was not pretended that either of the experts offered was personally offensive to appellee, or that the proposed examination would be attended with danger, delay or inconvenience even. Personal security in any form was not so much as mentioned, eo nomine at least, as a ground of objection. Dr. Reily, it will be remembered, amputated her limbs in the first instance. The only specific objection urged was that the proposed experts were in the employment of appellant, and might be biased. This objection, as before seen, went to the weight and not to the admissibility of the evidence. It is to be inferred from the record that if this objection had been overruled by the court, the examination would readily have been submitted to then and there. We can not, therefore, escape the conclusion that the real objection to the proposed examination was other than personal security, and hence that the numerous cases cited as authority, both in and out of this State, are not in point.

The only case cited or found that is at all parallel is that of Haynes v. Town of Trenton, 27 Southwestern Reporter, 622, decided by the Supreme Court of Missouri. The point decided is thus correctly stated in the eighth syllabus, which seems to have been prepared by the judge: "Per Macfarlane, J. (Black, C. J., and Brace, J., concurring): Where plaintiff exhibits his injured leg to the jury on a trial as to the cause of the injury, it is error to refuse permission to the adverse party to have the leg examined in open court by experts, with a view to introduce their testimony as to the character of the injury and its probable permanency." In the course of the opinion of Judge Macfarlane, in which two of the other three judges of that division of the court seem to have concurred, and from which the remaining judge does not seem to have dissented, this language is used: "Defendant had the undoubted right, in this case, at any time after the injuries had been shown to the jury, to have physicians examine the injured leg, and testify as experts to its character and probable permanency. The question was not as to the right of defendant to have an examination of the injuries made, but as to the right to test the effect and reduce the weight of evidence introduced by plaintiff."

So we hold in the case at bar,—not that the court should have appointed physicians to make an examination in the first instance, for we have no statute prescribing such procedure, but that when appellant's counsel made the following proposition, as shown in the bill of exceptions, "Doctor, will you please here and now examine the plaintiff and her injuries?" the objection made by appellee's counsel should have

been overruled and the witnesses permitted then and there, or at such other reasonable time and place as the court might appoint, to make the proposed examination and give the result of it to the jury. It seems to us that this would have been simple justice, and consequently that it ought to have been done, thereby avoiding the appearance of an ex parte trial on this important issue. No harm could have resulted from such a course. Upon this ground, therefore, we feel constrained to order a reversal of the judgment.

The argument of appellee's counsel of which complaint is made was apparently of a very damaging character, in that it was calculated to arouse sympathy for appellee and prejudice against appellant. It purported, however, to be based upon facts in the record, though some of the inferences at least, if not all, were wholly unwarranted by the facts proven, and were clothed in language calculated to substitute in the mind of the jury such inferences for facts: In view of the conclusion already reached, we need not determine whether the judgment should be reversed upon this ground, taken in connection with the large and alleged excessive amount of the verdict.

*Reversed and remanded.*

HUNTER, ASSOCIATE JUSTICE *(dissenting)*.—I regret that I can not agree with my brothers on the opinion they present in this case. I think that the ruling of the learned district judge in refusing to require the plaintiff to unwrap and expose her wounded limbs to the company's doctors was exactly correct. It appears from the bill of exceptions that they were "surgeons of defendant and in defendant's regular employment;" that the plaintiff's counsel had previously refused to allow them to examine her upon this ground, offering, however, at the same time, "to have plaintiff examined by any number of physicians the court might see proper to appoint on defendant's application who were not in any way connected with plaintiff or defendant."

Defendant then made application to the court, and upon this application the court appointed Dr. Stinson to make the examination, refusing to appoint the company's doctors or either of them, stating that Stinson could act or not as the parties themselves desired. At this juncture, it seems, defendant's counsel placed two of the company's doctors on the stand, and requested them then and there "to examine the plaintiff and her injuries," and I infer that the aforesaid doctors were then and there about to seize the plaintiff's limbs and examine them, nolens volens, when her counsel came to her rescue, again objecting to the assault upon her by these corporation doctors, placing their objections upon the grounds (1) that they were in the employment of defendant, and were partisan and not impartial; (2) that they had not been appointed by the court to make such examination; and (3) that defendant had no right to have such examination without the plaintiff's consent, agreeing at the same time to submit herself to such examina-

tion at the hands of any other doctors considered by the court to be impartial and competent, and not in the employment of defendant.

In order to have a clear understanding of the question as it stood for decision in the District Court, at least upon the motion for a new trial, and as it stands in this court, I think it is proper to state here that the record shows that defendant accepted the order appointing Dr. Stinson to make the examination, and acted upon it, because the undisputed evidence is that, after he was appointed, defendant's counsel took him to Mrs. Langston and caused him to examine her, and then failed to put him on the witness stand, when the plaintiff herself called him as a witness and he testified fully as to the condition of her injuries and whether she would be able to wear artificial limbs or not, his evidence agreeing in the main with that of Dr. Poindexter. It is important to note, furthermore, that this effort to force an examination was not made until after the plaintiff had been twice upon the witness stand, and had testified fully and exhibited her limbs to the court and jury, and her cross examinations, partly referring to the condition of her limbs and ability to wear artificial limbs, cover ten pages of typewritten matter in the record; that it nowhere appears in the record that the company's doctors were not present during her entire examination as a witness, and had every opportunity to view and examine the injured limbs and question her fully concerning the same; that it occurred after she had closed her evidence in chief. It also appears that Dr. Poindexter had examined her limbs on the day the trial began, and it nowhere appears, nor does defendant's counsel contend, that Dr. Poindexter and Dr. Stinson were incompetent or had not made a thorough examination, or were interested in behalf of the plaintiff, or in any manner partial to her or prejudiced against the company, but they stand here as graduated, competent, and experienced physicians and surgeons, with long years of practice, without a breath of complaint against them of any character, and it does not appear that the company's doctors did not hear them testify fully describing the injuries and their condition and appearance.

I think that, under this view of the case, the court did not err in refusing to appoint the company's doctors to examine her limbs out of court. Her counsel had refused to consent to the appointment, and the court, in the absence of a statute, had no power to enforce such an order against her will. We held this, in effect, in the Pendery case cited by the majority, and the Supreme Court refused a writ of error therein. Nor did the court err in refusing to compel her to submit to an examination of the company's doctors in open court on the trial. Our Supreme Court has intimated this view on several occasions, and I think has, in effect, so decided. Railway v. Norfleet, 78 Texas, 323; Railway v. Johnson, 72 Texas, 101; Railway v. Underwood, 64 Texas, 466.

In the Norfleet case, supra, Chief Justice Stayton said for the court: "Such an order should never be made, unless in a case in which the

ends of justice imperatively demand it, and in no case should such an order be made when the party is willing to be examined by competent and disinterested men without such order. If, however, a court should refuse to make such an order under a state of facts that would justify it, this would not be ground for reversal, if it appeared that during the trial opportunity for such examination was given. On the trial of this case plaintiff submitted his injured limb for examination, it was examined, and there is no reason to believe that any physician or surgeon brought by appellant would have been refused an opportunity to make a full examination."

Our present Chief Justice Gaines, in the Johnson case, supra, speaking for the court, said: "If this power should be exercised at all, it should be by the appointment by the court of one or more disinterested experts, either of its own selection or such as may be agreed upon by both parties." Our brothers of the Fifth District, it seems, take the same view of the question. Railway v. Nelson, 5 Texas Civ. App., 387, 24 S. W. Rep., 588. And so it has been ruled in the First. Railway v. Berling, 14 Texas Civ. App., 544, 37 S. W. Rep., 1083. And our Supreme Court refused a writ of error in the latter case.

The Court of Appeals of Kentucky hold "that such examination may be required in the exercise of a sound discretion on the part of the trial court, and when it fairly appears that the ends of justice require it, and that knowledge of necessary and material facts can only be brought to light by such examination;" and that court affirmed a judgment where the lower court had refused to make such an order, because "eighteen months had elapsed from the time of the accident to the date of the trial, and it was apparent to all that the appellee was a cripple. It was an undisputed fact that he had suffered extreme and excruciating pain. His right thigh was broken, his left thigh mashed, and his body otherwise bruised and injured. An examination by the company's expert physicians, or by a commission of learned doctors, might have informed the jury of the exact nature of the trouble under which the appellee labored, and have clothed their information in the usual technical nomenclature of the profession, but the patent fact that the man had thus suffered and was a cripple could not have been explained away. In the courts where the power to compel a submission to such an examination is upheld—and it is denied in many—it is not held that a defendant has an absolute right to demand such an order, but as we have said, the motion therefor is addressed to the sound discretion of the court." Distilling Co. v. Riggs, 45 S. W. Rep., 99.

In Railway v. Rice, 144 Illinois, 227, 33 Northeastern Reporter, 953, the Supreme Court of Illinois say: "The extent to which courts have gone, sustaining the power to compel such examinations, is that such orders may be made in the sound legal discretion of the trial court, when it appears that such an examination is reasonably necessary to the attainment of justice. * * * But the ruling in this case was placed upon the broad ground that the court had no power to grant the motion,

and this court is committed to that doctrine." Parker v. Enslow, 102 Ill., 272; Loyd v. Railway, 53 Mo., 515.

In Railway v. Michaels, 57 Kansas, 474, 46 Pacific Reporter, 938, the Supreme Court of Kansas, while asserting the power of the trial court to compel a physical examination, denied it to the railway company in that case, because the application was not made until after plaintiff had closed his evidence, and furthermore, because no necessity was shown to exist requiring such an order.

In Stuart v. Havens, 17 Nebraska, 211, 22 Northwestern Reporter, 421, the same question arose and in almost identically the same manner as here. In delivering the opinion of the Supreme Court of that State, Justice Maxwell said: "The plaintiff below on his direct examination was asked to show his arm, which he claimed was injured by falling into the excavation, to the jury. This he did without objection, and afterwards three physicians who had treated the arm professionally testified as to its condition, without objection. Afterwards the defendant below asked the court below to make an order requiring Havens to exhibit his arm to four physicians called by him (the defendant). This the court refused to do," and error was assigned on this refusal. Discussing this assignment, the court further said: "Where, in a case like this, experts are called by a party, and permitted to make a personal examination of the person injured, and to testify therefrom, there is danger that they will feel under obligations to the party calling them, and, however honest they may be, color their testimony somewhat in his interest; while in many if not most cases their general views upon the question will be known to the party producing them before they are called. In any event, the evidence partakes somewhat of a partisan character. To avoid this they should be agreed upon by the parties, or appointed by the court, and an examination, if desired, should be made before the trial begins, although the court may permit it to be made during the progress of the trial."

The reasoning in the above case is of peculiar force here, because the bill of exceptions here shows that the company's counsel knew and were able to state to the court in advance what these company doctors would swear, for they insert in the bill these words: "Defendant could have proved by said witnesses that plaintiff could at that time wear artificial limbs without pain, and get about on them in such manner that her injuries could not be detected in her locomotion." The majority, it seems, rely upon this statement for a predicate that the evidence of these doctors would have been so favorable to defendant as to have influenced the jury in determining the amount of the verdict, and therefore, in their judgment, the excluded evidence was material.

I have no right to doubt that counsel's statement was true, and being true, it was almost sufficient in itself, in my judgment, to exclude the witnesses from testifying *as experts*, because an expert should come onto the witness stand without himself knowing what his evidence will be, where he is ignorant of the facts upon which his opinion is desired,

as must have been the case here, to show any necessity for the examination, and to entitle appellant to raise this question at all. See also Turnpike Co. v. Baily, 37 Ohio St., 104; Railway v. Finlayson, 16 Neb., 578; Railway v. Hill, 90 Ala., 74; Shepard v. Railway, 85 Mo., 632.

I conclude, then, from the trend of the cases cited holding that the trial court would have the power to order the examination, that this power should be exercised only in cases where the facts can not be obtained otherwise and the ends of justice imperatively demand it, and not where, as in this case, the nature and extent of the injury was patent, and the limbs had been exhibited to the court and jury, and it is not shown that defendant's physicians were not present at the time. While this specific objection was not made by defendant's counsel, yet if the evidence was properly excluded for any legal reason, this court should not reverse the judgment.

But I justify the action of the court upon the further ground that the courts of this country, in the absence of a statute, have no such powers. It may be that the State, by an act of the Legislature, might require ladies in such cases to submit to such examinations in response to the imperative demands of justice, under the penalty of being denied relief in her courts; but under our Constitution such a statute would raise a serious question, and it would not be in accord with the genius of the American republic, nor with the sentiment of the people of Texas.

The Supreme Court of the United States, in the case of Railway v. Botsford, 141 U. S., 250, denied the existence of such a power in any court. Justice Gray says: "The inviolability of the person is as much invaded by a compulsory stripping and exposure as by a blow. To compel anyone, and especially a woman, to lay bare the body, or to submit to the touch of a stranger, without lawful authority, is an indignity, an assault, and a trespass; and no order or process commanding such an exposure or submission was ever known to the common law in the administration of justice between individuals, except in a very small number of cases, based upon special reasons and upon ancient practice, coming down from ruder ages, now mostly obsolete in England, and never, so far as we are aware, introduced into this country."

In Railway v. Griffin, 80 Federal Reporter, 282, where the physical examination of the plaintiff was asked for during the trial, Judge Woods, in delivering the opinion of the Circuit Court of Appeals, after citing Railway v. Botsford, supra, says: "The reasoning of that case forbids a compulsory examination during the trial equally with one in advance of the trial."

In Lyon v. Railway, 142 New York, 298, 37 Northeastern Reporter, 113, the Court of Appeals of New York, speaking through Mr. Justice O'Brien, shows that the power to compel a party to submit to personal examination by physicians exists only by virtue of an amendment to an article of their statute authorizing plaintiff's deposition to be taken, and after citing with approval the above language of Mr. Justice Gray, he

adds: "This amendment has changed the law, but it is not so certain that it will ever change the general sentiment of mankind which was expressed in Judge Gray's remarks." See also McQuigan v. Railway (N. Y. App.), 29 N. E. Rep., 235; Roberts v. Railroad, 29 Hun, 154; Pennsylvania Co. v. Newmeyer, 129 Ind., 410.

In the Newmeyer case, supra, the Supreme Court of Indiana said: "To say that the power rests in the sound discretion of the court does not meet the case, for the real question is as to whether the power exists at all. So far as we know, the courts of this State have never attempted to exercise such a power, and we are of the opinion that no such power is inherent in the courts. We think the better reason is against the existence of such a right, and, in the absence of some statute upon the subject, we do not think the courts should attempt to compel litigants, against their will, to submit their persons to the examination of strangers for the purpose of furnishing evidence to be used on the trial of a cause. Should a litigant willingly submit, there could be no legal objection to such an examination, and should he refuse to submit to a reasonable examination his conduct might possibly be proper matter for comment, but this is quite a different matter from compelling him, against his will, to submit his person to the examination of strangers."

In Mills v. Wilmington (Del. Super. 1894), 2 Hardesty, 31, it was. held that although the plaintiff had exhibited his leg for examination to physicians, he could not be compelled to expose his leg to the jury for the purpose of explanation by one of the physicians.

True, the language of Judge Gray was used in a case where the examination was sought out of court, but from the reasoning above I am led to believe, with the Circuit Court of Civil Appeals in the Griffin case, supra, that if her body was secure from the "touch of a stranger" out of court, this right of personal security would follow her even on the witness stand. And though she may have voluntarily exhibited her limbs to the jury on one occasion during the trial, there is not power enough in the American governments, State or Federal, in a controversy between herself and a private person or corporation, to lift the hem of her tattered skirt and expose her mangled limbs to public gaze, or require her to do so against her will. The right of personal security wherever the common law of England obtains is one of the absolute rights of individuals, and the pride of the Anglo-Saxon race, and in our declaration of independence we have declared it to be inalienable. She can not deprive herself of it. She can not contract it away. Nor can she by any act of hers estop herself from the right to assert it. It is the shield of her person, except against the State's right to punish her for crime whereof she is duly convicted according to the laws of the land.

I would gladly close this dissent here, but if there is any assignment in the record upon which I could agree to a reversal of the judgment it would be my duty to do so. Hence I feel compelled to discuss other assignments, in order that my reasons for not agreeing may be known.

It was proved by several of plaintiff's witnesses that none of the

trainmen or other servants of defendant assisted or offered to assist the plaintiff in boarding the train. Defendant moved to exclude this evidence from the jury, because it was not the duty of defendant to furnish passengers with servants to assist them in boarding or alighting from its trains, except where they are old or infirm, or incumbered with baggage or bundles, etc., and that such evidence was calculated to mislead the jury. The court refused to exclude it, and, under the circumstances of the case, I think properly.

It seems that where the passenger is not afflicted or incumbered in some way, it is not the duty of the railway company to assist her in boarding the train or alighting therefrom. In such cases, it is only necessary for the company to stop its trains at the stations for a length of time reasonably sufficient for passengers to get off and on, of course furnishing them proper and safe facilities for doing so. When this is done, the passenger must do the rest. But plaintiff's theory was that, as it was night and the platform was not lighted, and as the train was behind time, and only stopped from three to ten seconds,—not long enough to discharge and take on the passengers in safety, without assisting them,—it was a question for the jury to determine whether, under these circumstances, it was negligence in the company to fail to assist the passengers in boarding the train on that occasion; and in that view and theory of the case, I think the evidence was competent. Railway v. Miller, 79 Texas, 78; Railway v. Finley, 79 Texas, 85; 4 Elliott on Railroads, sec. 1628, and cases cited.

The twelfth assignment of error complains of the opening speech of the plaintiff's counsel, and the points raised are shown by the following statement from appellant's brief: "Judge Wilkins, one of plaintiff's counsel, in his opening argument, used the following language: 'Gentlemen of the jury, this is an unequal contest, this poor woman on one side and this powerful corporation on the other. I say that the evidence shows that it is an unequal contest. Look at the array of witnesses on one side that came here for the railway company, and the number that came for Mrs. Langston. We allege in our petition that the train crew was drunk. There was enough testimony in this case to raise the issue. It don't seem to me that the men could have been sober and gave no attention to the passenger cars and passengers in the cars. It was a grave charge made upon the conductor and his underlings. They knew the charge had been made, and the attorneys of the railway company knew the charge had been made, and they didn't open their mouths about it. The man who run that engine was charged with being drunk, and didn't deny it. There were some depositions taken in this case by the notary who had testified in this case—questions propounded by the defendant and crossed by the plaintiff, and the answers written down, sworn to by the witnesses, and certified to by Mr. Collier, that never found their way into this courthouse. Who is responsible for that I do not know. I hope no lawyer in this case. It was not the proper thing to do. Gentlemen of the jury, when these depositions were taken, if it was

found by anybody who had any authority in the matter that they were against the defendant, it was their duty to let them be returned to the court, filed here as testimony in this case, to be used by the plaintiff if she saw proper to use them, even if the defendant did, on those depositions, lose the case. But they disappeared. Where they went I do not know. I don't know who was responsible for them, whether it was the agents of the railway company or the notary public, and I don't believe it was the lawyers. But they are gone. Those depositions were against the defendant; otherwise they would be on file here to-day to be read to you. We were entitled to them, but we did not get them. That poor woman who sits there with her limbs cut off, helpless as she is, was entitled to those depositions to be used for whatever they were worth; but you can't get them. They are gone. Collier testified that he took them, but no explanation is made of their absence. They are unaccounted for. Nothing more is said about them by the defendant. When he testified that they hadn't been returned to the court, they didn't attempt to explain it away. Nothing more was said about it. They ought not to have done this poor woman that way; they ought to have given her a fair chance. This is almost a death struggle for her. If there is anything in her favor, let her have the benefit of it. Don't take it away. Don't rob the grave. Give her a fair show.' Which language and argument the defendant then and there excepted to in open court, as calculated to leave a false impression on the minds of the jury as to the duty and liability of the defendant, to arouse their prejudice against defendant, and elicit their sympathy in behalf of the plaintiff. Which objection the court overruled, to which ruling defendant then and there excepted, and tendered its bill of exceptions number 17."

The court, before signing, added the following explanation to this bill: "The above bill is signed with the following modification and explanation: The remarks of Mr. Wilkins contained in the first paragraph of the above bill of exceptions were objected to at the time made by Mr. Lassiter, of counsel for defendant. Mr. Wilkins objected to being interrupted. Mr. Lassiter said that he would not interrupt the speaker any more. Mr. Wilkins replied that he did not wish to be interrupted unless there was good grounds for it, but that he would thank Mr. Lassiter to call his attention to the fact that he was out of the record, if that should occur, and that he, Wilkins, would correct it. Mr. Lassiter, who followed Mr. Wilkins in the argument, discussed before the jury the remarks made by Mr. Wilkins as set forth in said bill of exceptions."

It seems, from the district judge's explanation of this bill, that he did not understand that any part of the speech was objected to except the first paragraph, which relates only to the case presenting an unequal contest, with "this poor woman on one side and this powerful corporation on the other," and to the remarks about the train crew being drunk. In support of the first statement, he said to the jury: "Look at the array of witnesses on one side that came here for the railway

company, and the number that came for Mrs. Langston." The record indicates that there were about ten witnesses who testified for the plaintiff, and about twenty-six for the defendant.

The remarks about the train crew being drunk were explained by him to be based upon the fact "that the petition charged it, and that the defendant's counsel knew it, and did not open their mouths about it." His remarks show that he only inferred they were drunk, because "when on the stand they did not deny it, and because it did not seem to him that they could be sober and give no attention to the passenger cars and passengers in the cars." I am unable to see that any harm could have resulted from this part of the opening speech, and if so, it was easily answered and easily turned against the side using such assertions and inferences for argument. An advocate worthy of the name understands very well how to turn such unsupported arguments and assertions to his own advantage with powerful force, and ought to be delighted at the opportunity to do so, without troubling any court with such matters. I am very much averse to limiting counsel in their speeches to the jury, so long as they keep within the bounds of any kind of inferences which may be drawn from proven facts or from the absence of such. These attenuated, filmy inferences often establish the weakness of the speaker's cause, and ought to be gratifying to the opposing counsel, where he has the opportunity of answering them, rather than ground of complaint.

The reference to the depositions which Collier had not returned was not improper. There was sufficient evidence admitted without objection from appellant to entitle counsel to contend that they had been taken by defendant, and being unfavorable to it, had been withheld and never filed. The inference was legitimate and strong from the facts proved.

The balance of the speech, if considered as objected to, was rather in the nature of an appeal for justice and for sympathy, and was not any stronger than the facts of the case warranted. It is perfectly legitimate, in my judgment, for an advocate to magnify the wrongs which he conceives have been perpetrated upon his client by the adverse party, and appeal to the humanity and sympathy of the jury or court,—to their sense of right and justice,—aye, sweep every chord of every sentiment of the human soul until they vibrate in unison with those of the speaker. This is one of the purposes of oral argument, and to deny an advocate these rights is to violate the law of the forum, and deprive litigants of the advantages they have a right to expect from the employment of skilled, able, eloquent, or experienced lawyers.

A distinguished writer on the subject says: "The benefit of the constitutional right to counsel depends very greatly on the freedom with which he is allowed to act, and to comment on the facts appearing in the case, and on the inferences deducible therefrom. The character, conduct, and motives of parties and their witnesses, as well as of other persons, more remotely connected with the proceedings, enter very largely into any judicial inquiry, and must form the subject of comment, if they

are to be sifted and weighed. To make the comment of value, there must be the liberty of examination in every possible light, and of suggesting any view of the circumstances of the case, and of the motives surrounding it, which seem legitimate to the person discussing them." Weeks on Attorneys, sec. 110. Again, quoting from the case of Garrison v. Wilcoxson, 11 Georgia, 154, he says: "Parties have a right to appear by counsel, and it is the privilege of counsel to address the jury on the facts. If the jury are to disregard the argument of counsel altogether,—if they are to shut their ears to their illustrations, comments, and reasonings,—how unmeaning, indeed, how absurd, is the appearance of counsel. It is a most valuable right to be represented by learned and eloquent counsel, not only before the court as to the law, but also before the jury as to the facts." Weeks on Attorneys, pp. 240, 241; Abbott's Trial Brief, "Counsel's Address to the Jury," p. 136, sec. 11, and cases cited. See also Railway v. Brown, 40 S. W. Rep., 612; Ferguson v. Moore, 39 S. W. Rep., 343.

The only point that can legally be made against eloquent appeals to the sympathies of the jury is that the verdict is for more than the evidence fairly sustains, and can not otherwise be accounted for; and where such is the result of such appeals, it is the duty of the courts to set aside such verdicts or reduce them to a sum sustained by the evidence. Counsel may therefore appeal to the sympathies of the jury, but at the risk of having the verdict set aside or reduced by the court, if excessive.

This brings me to the only other serious question in the case, and that is, whether the verdict is excessive. It is for $25,000, with no exemplary damages included. Is this sum more than enough to fairly compensate the plaintiff for her pecuniary loss and physical and mental suffering? I have hunted the books through for some definite rule to guide me in the solution of this question, and have found none. I do not think that the eloquent and pathetic language of counsel complained of pushed the verdict beyond the amount at which the mute appeals of her mangled limbs would have placed it. But even these mute appeals sometimes do great injustice, especially with humane and tender-hearted men, whose sympathies—all unconsciously—overcome their reason and judgment, and when this is so, it is the duty of courts to set aside or reduce verdicts found under such influences.

The highest function of a trial court is to arrive at exact justice in the particular case, but this must be attained according to the law of the land; otherwise no man could know his rights or duties. In the trial of such causes as this, where the damages claimed are unliquidated and are based, not only upon pecuniary loss, but upon physical and mental suffering as well, it is the peculiar province of the jury to assess the *amount* of the damages, and when assessed by them the court has no right to disturb their verdict, unless it is shown that some error has entered into the estimate, or that it has been unduly affected by some improper influence.

In Brooke v. Clark, 57 Texas, 113, our Supreme Court said: "In a

case of this nature, where the actual damages may include mental suffering through life, the court can rarely set aside a verdict as excessive."

In Railway v. Porfert, 72 Texas, 353, where plaintiff had one leg broken, and was disabled for life, and had suffered twenty-one months, and his leg was not well at the trial, the court said they could not say that $14,167 damages was excessive, though large, where the trial judge had approved it, citing Railway v. Dorsey, 66 Texas, 148, and numerous other Texas cases. See also Railway v. McClain, 80 Texas, 98, and cases cited; 1 Suth. on Dam., 2 ed., secs. 459, 460; 3 Suth., sec. 1256, and note.

Here the record shows that the plaintiff was 37 years old at the date of the injury, was in robust health, and engaged in a business that brought her an income of from $3 to $5 per day, say an average of $1500 a year. It is shown that she is now helpless, and requires the aid of an assistant or servant all the time, and probably will the rest of her life. The proof shows that this assistant or servant will cost her from $30 to $50 per month, say an average of $500 a year. This gives $2000 a year, counting the loss of her income and what she must necessarily pay out on account of the injury. It was proved that her health had been impaired by reason of this injury, and that she had been compelled to employ physicians and buy medicines, and in all probability would have to continue to do so for years. This last item might run from $100 to $300 a year, or even more. I am not informed by the statement of facts what her life expectancy is, nor what amount would be required to purchase for her an annuity of $2000 or $2500 a year during the remainder of her natural life, if such can be obtained in this country. The statement of facts shows: "It was admitted by defendant's counsel that her injuries were permanent, and that she suffered all the pains that any person would suffer from such injuries."

Her physical suffering, the record shows, had been great and intense up to the time of the trial, a period of thirty-two months, and her back and breast, which she testified were also injured in her fall under the wheels, were paining her on the trial, as well as her limbs. One of her limbs was not then healed, and the other, though healed, was extremely tender, and the evidence tended to prove that they would never be well unless she submitted to another amputation, which would be attended with danger to her life. She was suffering pain on the day of the trial, and in all probability would continue to suffer the balance of her days. Her mental sufferings over her mutilated condition for life—dragging out a living death, as it were—can be better imagined than described.

All these facts and figures the jury had before them, and they have found an amount which at first shocks the conscience, until the injury is contemplated; but when the injury is considered, I am unable to say that it is excessive. The record fails to furnish any data which enables me to point out wherein and how much it is excessive; and hence I have finally concluded, after many consultations and much hesitation, that there is nothing in the record that would justify this court in set-

ting it aside. The jury were certainly severe, but I can not say unjust. The district judge before whom the trial took place is distinguished for his fairness, impartiality, and learning. He heard all the witnesses testify; observed their manner; became conversant with every detail of the facts; himself saw the condition of the injured limbs, and the full effect they had produced upon the health, happiness, and life of the plaintiff, and it was his duty to see that no injustice was done the defendant, but to accord to it all of its rights under the law. He has ratified the verdict by refusing to set it aside, and I fail to see wherein we are justified in reversing his judgment.

I think the judgment ought to be affirmed.

### ON MOTION FOR REHEARING.

STEPHENS, ASSOCIATE JUSTICE.—In disposing of this motion for rehearing, we deem it proper to notice the case of Stuart v. Haven, 17 Nebraska, 211, cited for the first time in the dissenting opinion filed a few days after that of the majority, Justice Hunter, to whose lot this record fell for examination in the first instance, not having found the case till after the opinion of the majority was filed.

It is apparently in point upon the question of difference between us, since it is in one respect like the Missouri case (27 Southwestern Reporter, 622), cited and followed, in that the plaintiff on his direct examination had exhibited his injured limb to the jury; but that feature of the case does not seem to have been urged or considered in the disposition of the appeal, for just preceding the quotation made from the opinion by Justice Hunter is the following: "The question here involved was before this court in Railway v. Findlayson, 16 Nebraska, 578 (same case, 20 Northwestern Reporter, 860), and it was held that when the request was made during the trial, and it was sought to have the examination made by experts called by the adverse party, and not by those agreed upon by the parties or appointed by the court, there was no error in denying that request. We adhere to that decision. We are aware that the Supreme Court of Wisconsin, in White v. City Railway, 21 Northwestern Reporter, 524, seems to have established a different rule; but the one adopted by this court before that decision was made seems more conducive to justice."

In the case thus referred to as authority, Railway v. Findlayson, 16 Nebraska, 578, the injured limb had not been exhibited, and it was held, contrary to the rule which we understand to prevail in this State, that the court had the power in the first instance, upon application of the defendant before the trial, to compel the plaintiff to submit to a personal examination by impartial experts agreed on by the parties or chosen by the court; but it was further held, that experts called by the defendant would not be treated as impartial.

The right of a defendant, after the plaintiff has voluntarily exhibited to the jury his injured limb in order to show the character and extent

of the injury, to call one or more experts of his own selection to inspect the same, and diminish the force of such physical or demonstrative evidence, by way of cross-examination, does not seem to have been considered in either of the Nebraska cases. On the other hand, in the Missouri case this was the very point decided, as distinctly appears from the following quotation from the opinion: "It appears from the record that, during the trial, plaintiff was permitted to exhibit to the jury his injured leg. This was done while plaintiff was under examination as a witness in his own behalf. The evidence tended to prove that plaintiff had previously sustained an injury to the same leg at or near the same place. In a former trial, experts had been permitted to examine the leg, and testify as to its condition and the probable permanency of the injuries. After plaintiff had shown his leg to the jury on this trial, and evidence had been offered tending to prove that the injuries were greater than they appeared on the former trial to have been, defendant, as a part of the cross-examination of plaintiff, asked that physicians who had previously examined the leg might be permitted to make a further examination, and give their opinion as to its condition as compared with that when previously examined. This request the court refused, and in doing so we think it committed reversible error. The leg, when shown to the jury, became evidence in the case, which may have carried with it great weight, particularly in the matter of the damage sustained. This evidence, thus put into the case, was open to attack by the opposite party in any manner which may have tended to reduce its probative force. When, for example, a piece of machinery or material, the character or quality of which is in issue, is exhibited to the jury, it is always competent for the opposite party to have experts examine it, and give the jury their opinion of the quality of the material and the sufficiency of the machinery. When admitted in evidence, and its damaging effect has been accomplished, it can not be withdrawn until the party affected by it has had an opportunity to apply every test for the purpose of overcoming its force and effect. No reason can be urged why a different rule should be applied when an injured limb is the subject of inquiry." 27 S. W. Rep., 623, 624.

The question then, it may be added, is, must a defendant in the exercise of the right of cross-examination in such cases use only such experts as the court may select for him, or may he make his own selection? Since it is held that there exists no mode of procedure in this State such as seems to be recognized in Nebraska, authorizing a court to appoint experts to examine those suing for damages on account of personal injuries, all that seems to be left of this question is, does the right of cross-examination, where the injured part is exhibited in evidence, exist in this State?

As before seen, it is held to exist in Missouri, and we see no good reason why it should be denied here. In Nebraska and other States, where the power of the court to appoint experts and compel a party to submit to an examination by them is maintained, it is doubtless correct

to hold, as has been intimated by our Supreme Court, that, like the appointment of surveyors to trace boundaries and make a report to the court, none but impartial experts should be appointed, and some courts have even intimated that in all cases expert witnesses should be selected by the judge; but the prevailing general rule is, and the constant practice in this State has ever been, to allow either party to call experts of his own selection, leaving the fact of bias or prejudice to the jury to affect the weight of the testimony.  1 Whart. on Ev., sec. 456; Laws. on Exp. and Opin. Ev., rule 44; Dickenson v. Inhabitants of Fitchburg, 13 Gray, 546.

If we adopt the construction of the Nebraska case insisted on to support the judgment, the right to test by way of cross-examination the seeming force of demonstrative evidence through the aid of expert testimony must be denied in this State, for the power of the court to appoint experts here is held not to exist, except by agreement, and if the party himself calls them, that fact alone, according to the Nebraska decisions, renders them incompetent.  Thus a valuable right is taken away, depriving the courts and juries in the search for the truth of the light which modern science sheds upon many otherwise inexplicable phenomena.  For instance, the plaintiff, without offering any expert or other testimony as to its character, exhibits a ghastly wound to the jury, which has the appearance of being incurable, and obtains a large verdict from the defendant upon a finding to that effect, when if permitted to do so the defendant could have shown it to be quite otherwise upon examination by a competent expert.  The wound becomes the witness, making a mute appeal to the jury, and the defendant is without the means of cross-examination, if he can not call to his aid a medical expert.

Where the wound is not exhibited its condition must be shown by witnesses, who may then be subjected to cross-examination.  Either the right to cross-examine should be allowed where the injured part is exhibited as evidence, or the right to make such exhibition should be denied.  The latter right has been too often exercised to be now called in question.

One other case, also cited for the first time in the dissenting opinion, appears to be in point and at variance with the Missouri decision, that of Mills v. Wilmington (Del. Super.), 2 Hardesty, 31, 40 Atlantic Reporter, 1114; but the question was not discussed nor was any authority cited, the decision, which was by the Superior Court only, being placed upon the ground of a want of authority to compel the plaintiff to submit to an examination.  The Missouri case is of higher authority, rests, we think, upon sound reason, and is promotive of justice.  We therefore adhere to the ruling already made upon this point, though the question is not free from difficulty.

But inasmuch as appellee has elected by motion already submitted to have this question referred to the Supreme Court on certificate of dissent, instead of pursuing her remedy by writ of error, which would have

brought the entire record before the Supreme Court, we have concluded, in order to facilitate the ultimate disposition of the appeal, to state our conclusions upon the issue raised by the twelfth assignment of error and discussed in advance in the dissenting opinion. This assignment complains of the argument of counsel, which is quoted in the brief as well as in the dissenting opinion, and need not be again copied here.

As we read the record, the entire argument was objected to at the time, since it is all quoted in the first paragraph of the bill of exceptions, as copied in the transcript, the second paragraph stating only the grounds of objection. Transcript, pp. 255, 257. At any rate, objection was made promptly in the very beginning of the argument, and to the very first sentence, viz: "Gentlemen of the jury, this is an unequal contest; this poor woman on one side, and this powerful corporation on the other." That was not an issue in this case, and yet counsel was permitted over objection to argue it to the jury.

This was immediately followed by the "grave charge," and argument to sustain it, "that the train crew was drunk" when the accident occurred, which seems also from the ruling made to have had the express sanction of the court. That, too, though the petition alleged gross negligence in running the train with a drunken crew, was an issue of fact not raised by the evidence. On this we are all agreed. True, the testimony of one witness, and one only out of many having the opportunity to know the facts, was offered on this point, that of G. F. Thomas, who was on the train the night of the accident. Deposing in reference to the conductor, he said: "I can not say whether he was drunk or sober of my own knowledge. I did not see anything that would indicate specially that condition. I saw nothing that would indicate it when the train got to Bridgeport." In response to a further question, he said: "I do not think that I heard anything said on the train about it;" and being asked if he heard anything said about it at Bridgeport after the train arrived, he said: "I would not undertake to say that I did. I could not say. That question has been discussed, but whether or not it was that night it is a matter I can not tell." Being asked what his impression in reference to the condition of the conductor as to sobriety was, and as to what he heard said from Fort Worth to Bridgeport, witness said: "I could not have had any impression as to that question. I can not say that I had any impression from anything I saw that night, because I do not recollect whether the impression came from conversations with reference to the matter, or from something that occurred that night. If I saw the conductor, it was only when he came through the sleeper."

Though further interrogated on cross and redirect examination about the same matter, nothing further was elicited. His testimony did not tend in the slightest to prove the charge of drunkenness. If it did, then all one is required to do in order to raise an issue of fact for discussion before the jury is to charge it and then attempt, but fail utterly, to prove it, which might easily be done in any case. Certainly the fact

that drunkenness was charged in the petition and not specifically denied by the witnesses themselves, who were not interrogated on that subject, did not tend to prove the charge. Nor did the fact of the accident tend to prove it. If the issue of drunkenness had been in any way submitted to the jury in the charge, it would have been reversible error, because no such issue was raised by the evidence.

The evidence of negligence on the part of appellant and of contributory negligence on the part of appellee, as stated in our original opinion, was conflicting, but we are all agreed, and so find, that the preponderance of the evidence was against appellee upon both these issues. We are also all agreed that the verdict, if not excessive, which we are not now prepared to hold, was exceptionally large.

As to the other matter discussed in the argument, there were some circumstances in evidence tending to raise the inference that appellant had, through some agency not disclosed, purposely avoided having the depositions of two witnesses, both of whom, however, testified on the trial, returned into court, though appellee had propounded cross-interrogatories to these witnesses and waived commission; but the testimony of the officer taking them tended to rebut this inference. One of these depositions at least might or might not have been valuable to appellee on the trial, either as original evidence or as a means of impeachment of the witness.

Besides objecting to the argument and reserving a bill of exceptions, appellant sought a new trial upon this ground. We come, then, to the question raised by this assignment of error, viz., is appellant, upon the case made above, entitled to have this judgment reversed on account of the argument complained of?

The right of a party to be heard in the argument of his counsel upon an issue of fact raised by the evidence and submitted to the jury is of course not questioned. As said by Judge Brewer in Douglass v. Hill, 29 Kansas, 527, "It matters not how weak and inconclusive his testimony may be, if it is enough to present a disputed question of fact upon which he is entitled to a verdict of the jury, he has a right to present in the argument of his counsel his view of the case." But the rule is well settled, and was recognized in the opinion in that case, that where there is no evidence upon an issue, the right to argue it to the jury does not exist. Bankard v. Railway, 34 Md., 197; Lindley v. Railway, 47 Kan., 432; Harrison v. Park, 1 J. J. Marsh. (Ky.), 173; Tucker v. Henniker, 41 N. H., 317.

Nor is the right of counsel to make the most of his client's case questioned, so long as he confines himself to the issues and evidence. As said by Judge Fowler in the leading case of Tucker v. Henniker, 41 New Hampshire, 323, "his illustrations may be as various as the resources of his genius; his argumentation as full and profound as learning can make it; and he may, if he will, give play to his wit, or wings to his imagination." But this latitude is allowed, as was held in that case, only when he is discussing issues of fact which the evidence tends in

some measure to prove. Counsel certainly should not be allowed to evolve from his imagination and solemnly argue to the jury as an inculpating fact what he has utterly failed to prove; and this we think was done when the "grave charge" of drunkenness in the operatives of the train was "made upon the conductor and his underlings." Counsel is not even allowed to assume arguendo facts to be in the case when they are not. 2 Enc. of Pl. and Pr., pp. 727-730.

But we need not consult outside authority upon this question, for our rule 39 expressly provides that "counsel shall be required to confine the argument strictly to the evidence, and to the arguments of opposing counsel." Another and general rule provides that "any supposed violation of the rules prescribed in the conduct of a cause, to the prejudice of a party may be reserved by bill of exception, presented as a ground for new trial, and assigned as error by the party who may conceive himself aggrieved by such supposed violation."

Appellant, as already seen, has brought its complaint ·clearly within this general rule, and..there is little room for doubt, in view of the preponderance of the evidence against the verdict, the very large sum allowed as damages, and the almost irresistible appeal alike to sympathy and prejudices permeating the entire argument complained of, that the violation of rule 39 was to appellant's prejudice. In some respects at least, as was said in Dillingham v. Scales, 78 Texas, 205, "the remarks of counsel excepted to were not justified or called for by anything legitimately belonging to the case. We can not say that they did not improperly prejudice the jury. We can not say that they exercised no influence on the jury. If they exercised any, it was an improper one. The fact that we have no means, and the jury have none, of arriving at the exact amount of damages in such cases emphasizes the importance of guarding the minds of the jury from all misleading and improper influences and appeals." See Willis v. McNeill, 57 Texas, 462; Blum v. Simpson, 17 S. W. Rep., 402; Moss v. Sanger, 12 S. W. Rep., 619; Wichita, etc., Co., v. Hobbs, 23 S. W. Rép., 923; and many other cases.

The rigid enforcement of rule 39 should perhaps be insisted on in cases of this class, for the further reason that, besides the wide discretion given the jury in assessing damages for physical pain and mental anguish, such cases are usually, as is well known to the profession, undertaken on a contingent fee, and the transcript shows that this case is not an exception to the rule, though it does not appear that the distinguished counsel who made the argument was so employed.

Be this as it may, the argument, which, taken all together, presented to the jury in burning words the plea of a poor afflicted woman against a powerful corporation running its passenger train through the country with a drunken crew, thereby making her a miserable cripple for life, and then suppressing the testimony to prevent her recovery of damages—thus blending what was put in issue by the evidence with what was not—could not, we think, have been without prejudice to appellant. It is always the province of the judge who presides at

the trial, and not of the jury, to determine in the first instance whether or not an issue is raised by the evidence, and this rule applies to his control of the argument as well as to the matter of instructing the jury. Counsel should not, therefore, have been permitted to argue to the jury over objection, as was done in this case, that there was sufficient evidence to raise the issue of drunkenness. The approval by the court of that course was itself probably prejudicial, coupled with the circumstance that there was enough, when so skillfully handled by counsel, in the testimony of Thomas about his vague impressions—not sufficiently definite and tangible, however, to amount to evidence of any fact—to raise a damaging suspicion in the minds of the jury.

Our conclusion then is that the ruling complained of in the twelfth, as well as in the eleventh, assignment of error was both erroneous and prejudicial, and that for this additional reason the motion for rehearing should be overruled. Both questions will consequently be certified to the Supreme Court, the first upon motion of appellee and the latter upon our own motion, should it be held that the motion to certify is not broad enough to include both.

*Overruled.*

HUNTER, Associate Justice, dissenting for reasons stated in his dissenting opinion already filed.

For opinion of the Supreme Court on certified questions in this case, holding the argument of counsel and the refusal to permit examination by defendant's experts, as above shown, to have been prejudicial error, see 92 Texas, 709.